Josefa González de Margarida, Plaintiff and Appellant, *v.* José Calderón Miró, Defendant and Appellee.

No. 6678. Argued February 25, 1936.—Decided March 19, 1937.

*H. Torres Solá* for appellant. *R. Ramírez Pabón* for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

This action was brought in the District Court of San Juan, and the complaint substantially alleges that the plaintiff is the owner of two adjoining lots of land, and that the defendant is also the owner of another two adjoining lots, and that one of the latter abuts on one of the lots of the plaintiff; that the defendant has erected in his lots an ice plant, a garage, and a stable, and has opened a ditch that starts at the plant and runs across the lots of the plaintiff, for the purpose of draining the water, grease, oil, and other refuse matter coming from his plant; that there is no contract of servitude between the plaintiff and the defendant granting to the defendant the right to construct and to use the said ditch running across the lots of the plaintiff, and that the plaintiff has made demand upon the defendant to discontinue such use but without avail.

The defendant answered admitting the averments concerning the ownership and the location of the lots. He also admitted the existence of the ditch, but denied having opened it or that it started at his ice plant, and on the contrary alleged that the ditch is part of one opened over twenty years ago by the plaintiff's predecessor in interest for the purpose of draining a parcel that he owned, which was later subdivided into lots that he sold to several persons, among them the defendant.

He denied that grease, oil, other refuse matter, and boiling water flowed through the ditch, but, on the contrary, that there flowed pure water free from noxious substances and the rain water coming from his lots and from all the other higher estates that were sold by plaintiff's predecessor in interest. He denied the allegation that the contract did not exist and set up that by the deed of purchase and sale of the lot executed between the plaintiff's ancestor and the defendant, the latter acquired by way of a servitude the right to use the ditch as a drain, which ditch remained as an apparent sign of it. He denied that the plaintiff requested him to discontinue the user, and alleged that it was he who requested the plaintiff not to disturb him in the use of the ditch.

As new matter he alleged that over nine years ago he erected an ice plant on one of his lots which had been segregated from the property owned by plaintiff's predecessor in interest, and that the ditch that had been opened by the latter was already there; that said ditch was used by the persons purchasing lots to drain the accumulated water; that the lots belonging to the plaintiff are on a lower level than those of the defendant, and that the defendant collects and controls the waters coming from his industrial establishment and discharges them into the aforesaid ditch, which is a prolongation of the one opened by plaintiff's predecessor in interest over nine years ago; that the street that abuts on the lots owned by the plaintiff and by the defendant is on a higher level than the lots and has no sewerage system, and hence the only means of discharging the waters from the defendant's lots and from his industrial establishment to the nearest public sewer, is by way of the ditch running across the lots of the plaintiff.

The case went to trial. Extensive documentary and testimonial evidence, together with a view of the premises, was taken and based thereon and on the pleadings, the dis-

trict court rendered judgment for the defendant, without special imposition of costs.

We think it necessary to transcribe the statement of the case and opinion of the trial court, in order to clearly and fairly decide the fundamental question involved in the case. The court began by describing the lots in question and then said:

"The evidence introduced has shown that in order to drain these lots and the higher ones located in the same property, all of which are in an inclined plane lower than González Street and facing it, and also on a lower level than an embankment owned by the street-railway company that abuts on them at the rear, there was a ditch that ran across all the lots and up to a ditch pertaining to a public sewer and known as 'Los Muertos.' This ditch already existed in 1914 when Guillermo Rengel purchased his lot, which is the first one of that section, and, on which he erected in 1915 a house in which he lives at present. In order to lay out the land for building, the site was inspected in 1922 by the Sanitary Engineer Octaviano Marcano and the Inspector Quintín Santana Martínez; and was inspected again by the latter when the ice plant was constructed, and he considered the ditch as the natural drain or outlet of the land and of the water from said plant. Engineer José Llompart Meléndez, who in 1922 prepared the plan for the site improvement, also testified that Manuel González was a man of about 80 or 85 years of age and that his son, Luis González, was in charge of the property and was the one who acted for his father, and that the father later signed the deeds. That José Calderón Miró orally agreed with Luis González, when he purchased the lot, to allow him to use the ditch to discharge the water coming from the condensers of the ice plant, on condition that he kept it always clean so that the water would flow freely, inasmuch as there was no other means but that ditch to drain those waters into the 'Los Muertos' ditch, due to the inclination and the configuration of the terrain.

"The evidence has further shown that besides the surface waters and those discharged by the industrial plant of the defendant, there also flow through the ditch the waters coming from a cesspool located in the lot lying just before those of the defendant, now owned by Mrs. Eloísa Laborde de Quintero, and formerly by Mariano Font, which lot was also sold by plaintiff's predecessor in interest. These waters are carried by an underground pipe located at the rear of

the lots of the plaintiff, just where they abut on the embankment owned by the railway company.

"The view made of the premises on May 24, 1933, clearly proved that the lots that had been owned by Mariano Font and Gabriel Amorós, as well as González Street, are higher than the lots of the defendant; and that due to a wall erected on the southern side of the latter, the former drain into González Street because they are actually on a higher level than the street. However, the lots of the defendant are on a lower level than the street and the embankment on their eastern and western boundaries, and hence the waters naturally flowing therefrom have no other means of reaching the 'Los Muertos' ditch than by way of the ditch existing across the property of the defendant for over twenty years. The watershed servitude in question, granted by the prior owner to drain the water from the lots of the site improvement, binds the defendant as the successor in interest of the original owner, and he is now estopped to deny the existence of said servitude; and besides, in accordance with section 559 of the Revised Civil Code, lower estates must receive the waters which naturally flow from higher estates due to the existing inclination of the land. The evidence introduced has shown that the waters coming from the industrial establishment of the defendant are not polluted by harmful substances and that on account of the configuration of the terrain there is no other means of draining them except through the ditch; hence the court thinks that the plaintiff as owner of the lower estate is obliged to permit the water to flow freely, without prejudice to her right to recover damages for said service. 4 Manresa 681.''

The plaintiff and appellant maintains that the court erred in concluding that the evidence introduced showed that plaintiff's predecessor in interest had constituted the servitude, and that therefore the plaintiff is bound to repeat the same; and in applying to the case section 559 of the Revised Civil Code instead of section 524 of that code.

After a careful study of the record and of the briefs we have arrived at the conclusion that the judgment appealed from must be reversed.

Neither in the registry, nor in the title-deeds, nor in any private document is there the slightest evidence of the con-

stitution of the servitude in question over the lots belonging to the plaintiff.

It is true that all of the lots belonged at one time to a single person, the plaintiff's father, said lots forming a rural property which bordered on the town of Río Piedras. It is true that the owner of this property subdivided it in lots which he sold to different persons. It may also be conceded that the rain water which naturally flowed passed over the lots now belonging to the plaintiff after flowing over the lots that now belong to the defendant, until they reached the "Los Muertos" ditch. This was so because the lots of the plaintiff were on a lower level than those of the defendant.

If we were only dealing with the natural course of rain water where the configuration of the terrain had not been changed, the section governing the case would be section 488 of the Civil Code, 1930 ed., which is section 559 of the Revised Civil Code and section 552 of the Spanish Civil Code, and which provides:

"Usufruct is not extinguished by misuse of the thing in usufruct; but if the abuse causes considerable injury to the owner, the latter may demand that the thing be delivered to him, binding himself to pay annually to the usufructuary the net proceeds of the same, after deducting the expenses and the compensation that may be assigned to him for its administration."

But the situation was changed and with it the applicable law. Streets were planned and laid out. Two of the lots were purchased and now belong to the defendant, and two other lots to the plaintiff, by inheritance. The defendant erected in his lots not only an ice plant, but also the garage and the stable alleged by the plaintiff and established by the evidence, and the waters flowing naturally and artificially therefrom were discharged into the ditch that runs across the lots of the plaintiff. Those are not the waters that the lawmaker had in mind when enacting section 488.

That it was so understood at first by the defendant himself is shown by his allegation of the existence of a specific

contract on the matter, entered into between plaintiff's predecessor in interest and the defendant and hence binding on the plaintiff, and by his attitude at the trial in attempting to prove the existence of such contract.

We have examined that evidence and, in our opinion, it is insufficient. We have already stated that nothing appears from the registry nor from the title deeds relating to the lots. All the evidence introduced, which referred to a certain verbal agreement alleged to have been entered into by the defendant and a son of plaintiff's predecessor in interest, was oral evidence. The plaintiff persistently objected to the admissibility of such evidence; but we shall not stop to consider and determine whether or not he was right in so doing, as we are convinced of its insufficiency.

Plaintiff's father, who sold the lots to the defendant, and plaintiff's son who allegedly was in charge of the administration of his property, had already died at the time the trial was held. The oral contract granting a servitude of drainage to the plant, is not claimed to have been entered into directly with the father, but through his administrator, and no evidence was introduced to show that the son had authority from the father beyond the general administrative power. This being so, what value can be given to such a contract even supposing that its existence had been proved? The granting of an easement is an act of ownership and can only be validly effected by the owner or his attorney in fact duly authorized therefor. It was not shown what kind of a power to manage was held by the son, but supposing it to be the most extensive one that can be imagined, still it can not be inferred that it included the power to grant servitudes.

Therefore, as the right that might be passed on the prior unity of the lots and on their relative position, in accordance with the provisions of section 488 of the Civil Code, 1930 ed., is not sufficient, and as the existence of a binding contract entered into between the parties to grant the right of drain-

age of the waters and other substances coming from the ice plant, garage, and stable located on the lots of the defendant was not proved, it is necessary to acknowledge the right of the plaintiff to demand the discontinuance of the servitude.

Mere tolerance on her part in allowing for several years such a ditch, confers no definite rights on the defendant. Her attitude is understandable. So long as she did not need her lots and they were covered by vegetation, the ditch was ignored. It was when she decided to build on the land and to improve her lots accordingly that the ditch fully came into view with its black borders and conducting all the polluted waters from the lots of the defendant.

We have found no provision of law exactly applicable to this situation. The appellant herself suggests section 524 of the Civil Code, 1930 ed., which reads thus:

"When the yard or court of a house is enclosed between other houses, and it be not possible to give an outlet through the house itself to the rain water collected therein, the establishment of a servitude of drain may be demanded, giving an outlet to the waters at the point of the contiguous tenements where its egress may be the easiest, and establishing a conduit for the drain in such manner as to cause the least damage to the servient tenement, after payment of the proper indemnity."

There is no doubt that this section would afford to the parties a fair and easy way to settle the conflict existing between them, but we do not feel justified in deciding the controversy by applying it because that provision refers to rain water and other waters are involved in this case. By virtue thereof, our judgment must be confined to a decision of the appeal by reversing the judgment appealed from and ordering that the servitude be discontinued as prayed for by the plaintiff in her complaint, without special imposition of costs.

Mr. Justice Córdova Dávila and Mr. Justice Travieso took no part in the decision of this case.